## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jason DeCesare, individually, and p/k/a G.W. Bridge, or Triborough, 145 W. Gravers Lane, Philadelphia, PA 19118 | : : : : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : : | No. |
| | : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| Comcast Corporation One Comcast Center 1701 John F. Kennedy Boulevard Philadelphia, PA 19103 | : : : : : | |
| **Defendant.** | : : | |

## COMPLAINT
### Jurisdiction and Venue

1.      The jurisdiction of this court is based upon 28 U.S.C. § 1400(a), in that Plaintiff is an owner of valid copyrights which have been infringed upon in the Eastern District of Pennsylvania by the unlawful acts of Defendant(s) herein.

2.      Jurisdiction over this cause of action is also proper before this Court pursuant to 28 U.S.C. § 1331 as this copyright infringement civil action arises under the Constitution and/or laws of the United States, and Title 17 of the United States Code in particular.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1400 and/or 28 U.S.C. §1391(b)(2) in that a substantial part of the events giving rise to Plaintiff's claim for copyright infringement occurred in the Eastern District of Pennsylvania and in that Defendant(s) has been creating, broadcasting, selling, publishing and distributing an infringing broadcast and website (including but not limited to the website, newspaper advertisements, newspaper cover photographs, leaflets, television, webpages and/or other internet media) in the Philadelphia area, throughout the United States, and abroad.

4.      Venue is also proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(c) in that the Defendant(s) have substantial business contacts with the Eastern District of Pennsylvania as Defendant(s) (or its agents) have been creating, broadcasting, selling and distributing their television broadcasts and/or infringing website in the Philadelphia area, and throughout the United States and abroad.

## Parties

5.      Plaintiff Jason DeCesare, individually and p/k/a G.W. Bridge or Triborough, is a locally based photographer, and is a citizen of the Commonwealth of Pennsylvania, who can be served with process at the office of his undersigned counsel, residing at 145 W. Gravers Lane, Philadelphia, PA 19118.

6.      Defendant Comcast Corporation. (hereinafter "Comcast") is a Pennsylvania business corporation with a principal place of business located at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, PA 19103 (and therefore a Pennsylvania citizen), and upon information and belief, to do business in the state of Pennsylvania, and is registered to do business in the state of Pennsylvania, and owns and broadcasts the cable television program "It's Your Call With Lynn Doyle." Defendant Comcast has unlawfully infringed Plaintiff's copyright.

## Facts

7.      On or about April 27, 2007, Plaintiff took a unique photograph of a famous Philadelphia newscaster named Larry Mendte (hereinafter "Mendte photograph"), and on May 3, 2007, published that photograph, along with an interview that Plaintiff conducted with Mendte, on a website called Phillyist.com, under the pen name G.W. Bridge (as visible on the gutter credit at the bottom of the interview). A true and correct copy of the photograph and the article is attached hereto and incorporated herein as Exhibit A.

8.      On or about April 27, 2007, Plaintiff also published the same photograph of Larry Mendte under the pen name Triborough (as visible on the gutter credit at the side of the photograph), and published it on or about that date at http://www.flickr.com/photos/triborough/475018233/in/set-72157600143328818/, bearing a copyright notice indicating: "© All rights reserved." A true and correct copy of the Flickr publication is attached hereto and incorporated herein as Exhibit B.

9.      Then, on or about June 27, 2009, Defendant stole Plaintiff's Exhibits A and/or B, and used it throughout its television broadcast, It's Your Call With Lynn Doyle, concerning Larry Mendte (hereinafter "the infringing broadcast"), which as of the date of the initial filing in this matter (11/29/2011) was still available for viewing by the public at http://www.youtube.com/watch?v=o72_ZPdGCZ4. Upon information and belief, the availability of this broadcast on YouTube had been with the express knowledge and consent of the Defendant, as Defendant clearly controls the content on that YouTube channel.

10.     The Mendte photograph (Exhibit A or B) was stolen and used by the Defendant on at least the 1:47, 2:20, 2:33, and 4:48 marks of the infringing broadcast, true and correct screenshots of which are attached hereto and incorporated herein as Exhibit C.

11.     Therefore, Defendant intentionally, knowingly and willfully, directly and/or derivatively, outrageously, recklessly, negligently and/or maliciously stole the Plaintiff's

2

photo (attached hereto as Exhibits A and/or B), and thereby infringed Plaintiff's copyright on at least four occasions, as demonstrated in Exhibit C.

12.     Plaintiff's Mendte Photograph (Exhibit A) was registered with the Copyright Office, with an effective copyright registration date of March 18, 2011 at registration number VA 1-763-148. *See* Copyright Registration, a true and correct copy of which is attached hereto and incorporated herein as Exhibit D.

13.     The Defendant has intentionally and unlawfully stolen and reproduced the Plaintiff's photograph, infringing upon his copyrights therein and inuring considerable profits from the same.

14.     In so doing, Defendant had produced the infringing broadcast and website through the airwaves, cable providers, the Defendant's website and/or other media, adding to the considerable public popularity of its own products and/or services, and thereby infringing upon Plaintiff's copyright therein and inuring considerable profits from the same.

15.     Upon information and belief, the Defendant owns a copyright to the infringing broadcast and website.

16.     Upon information and belief, no copyright registration submitted by the Defendant to the Registrar of Copyrights mentions any derivation in Plaintiff's original photography, as aforementioned.

17.     By contrast, Plaintiff properly registered his copyright interests in the Mendte photograph (Exhibit A or B), by delivering his application, deposit material, along with the required payment, to the Copyright Registrar. Plaintiff has an official copyright for the aforementioned work from the Library of Congress with an effective registration date of March 18, 2011. *See* Exhibit D.

18.     No Defendant contacted Plaintiff at any time prior to, during, or after the infringing advertisement, concerning the use of his aforementioned photograph.

19.     Plaintiff did not give his consent, permission or license, in any way, to the Defendant to reproduce his copyrighted photographs, in any fashion, for any use in the infringing broadcast and website. Defendant reproduced Plaintiff's copyrighted photograph anyway, in violation of 17 U.S.C. § 106(1).

20.     Plaintiff did not give his consent, permission or license, in any way, to the Defendant to specifically include Plaintiff's copyrighted photograph as a derivative work contained in the infringing broadcast and website. Defendant prepared derivative works – namely, the infringing broadcast and website – based upon Plaintiff's copyrighted photograph anyway, in violation of 17 U.S.C. § 106(2).

21.     Plaintiff did not give his consent, permission or license, in any way, to the Defendant to specifically engage in the public distribution of Plaintiff's copyrighted

photograph contained in the infringing broadcast and website. Through the creation, publication, distribution, unlawful registration of copyright and/or sale of the infringing broadcast and website, Defendant publicly distributed Plaintiff's copyrighted photograph anyway, in violation of 17 U.S.C. § 106(3).

22.     Plaintiff did not give his consent, permission or license in any way to any Defendant to specifically include Plaintiff's copyrighted photograph in any public display (such as the infringing broadcast and website). Defendants performed and/or displayed Plaintiff's copyrighted photograph anyway, in violation of 17 U.S.C. § 106(4) and/or § 106(5).

23.     No Defendant has compensated Plaintiff in any fashion whatsoever for the use of his copyrighted photograph in the creation, publication, distribution, unlawful registration of copyright and/or sale of the infringing broadcast and website and/or use of the Plaintiff's photo therein.

24.     Upon information and belief, Defendant's infringing behavior, as aforementioned, has produced great profits for Defendant. None of these profits have been shared with the Plaintiff.

25.     Defendant knowingly and willfully, directly and/or derivatively, copied without independent creation, Plaintiff's copyrighted photograph for the specific purpose of infringing upon Plaintiff's copyright and to unlawfully enrich the Defendant at Plaintiff's expense, as Defendant never obtained a license from the Plaintiff, let alone his consent or permission, for the specific use of his copyrighted photograph in the infringing broadcast or website.

26.     In so doing, Defendant has been advertising its infringing broadcast and website through its broadcasts, websites and/or other media, adding to the considerable public popularity of its own products and/or services, and thereby infringing upon Plaintiff's copyright therein and inuring considerable profits from the same.

27.     Defendant knowingly and willfully, directly and/or derivatively, outrageously, intentionally, wantonly, recklessly and/or maliciously copied without independent creation, Plaintiff's copyrighted photograph for the specific purpose of infringing upon Plaintiff's copyright and to unlawfully enrich the Defendant at Plaintiff's expense, as Defendant never obtained a license from the Plaintiff, let alone his consent or permission, for the specific use of his copyrighted photograph in the infringing broadcast and website as aforementioned.

**PLAINTIFF v. DEFENDANT**
**COUNT I**
**COPYRIGHT INFRINGEMENT – 17 U.S.C. § 501 et. seq.**
**Request for Damages pursuant to**
**<u>17 U.S.C. §§503 through 505</u>**

28.     Averments 1 through 27 are incorporated as though fully set forth herein at length.

29.     The Defendant's infringing broadcast and website flagrantly infringes upon the Plaintiff's copyrighted photo, as aforementioned.

30.     Upon information and belief, Defendant falsely copyrighted the Plaintiff's photographs as an original work, with no credit given for the derivative photographs of the Plaintiff which is included in Defendant's infringing broadcast and website.

31.     As set forth more comprehensively above, Defendant has willfully and deliberately infringed upon Plaintiff's copyrighted photograph, resulting in extraordinary sums of ill-gotten profits.

32.     At no time did any Defendant have a license or authority of any kind to specifically use Plaintiff's copyrighted photograph in the infringing broadcast and website.

33.     The express use and inclusion of Plaintiff's copyrighted photograph in the infringing broadcast and website, as aforementioned, is evidence of Defendant's direct access to the same.

34.     Defendant has willfully infringed on the copyright owned by Plaintiff, one of which was properly registered with the Copyright Office. *See* Exhibit D.

35.     Based on the foregoing, and pursuant to 17 U.S.C. § 504, Plaintiff is entitled to have Defendant disgorge all profits earned (directly or indirectly) as a result of Defendant's copyright infringement.

36.     In the alternative to payment of Defendant's profits, pursuant to 17 U.S.C. § 504, Plaintiff is entitled to One Hundred Fifty Thousand ($150,000) Dollars per willful infringement.

37.     In addition, pursuant to 17 U.S.C. § 503, Plaintiff respectfully requests this Honorable Court to order the impounding of the broadcast and website, and to order the Defendant to cease and desist from further distributing them in any fashion, including on the internet, as the same is in violation of Plaintiff's copyright.

38.     In addition, pursuant to 17 U.S.C. § 505, Plaintiff respectfully requests this Honorable Court to order the Defendant to pay all costs incurred by the Plaintiff in the prosecution of this civil action, including, but not limited to, attorney's fees.

39.     The maximum statutory damages are particularly appropriate in light of Defendant's theft of Plaintiff's photograph and infringement of his copyright, especially

because no Defendant contacted Plaintiff for permission to use his photo on either occasion.

WHEREFORE, Plaintiff requests judgment against the Defendant for an accounting of all profits derived from use of the Plaintiff's copyrighted photograph, plus compensatory, punitive, and/or statutory damages, in an amount in excess of $150,000 (ONE HUNDRED FIFTY THOUSAND DOLLARS) representing said damages, Defendant's profits, interest, costs, attorney's fees, and such other relief as the Court deems appropriate.

**PLAINTIFF v. DEFENDANT**
**COUNT II**
**COPYRIGHT INFRINGEMENT – 17 U.S.C. § 501 et. seq.**
**Request for Injunctive Relief pursuant to**
**17 U.S.C. §§502**

40.   Averments 1 through 39 are incorporated as though fully set forth herein at length.

41.   Defendant has willfully infringed on the copyright owned by Plaintiff, one of which was properly registered with the Copyright Office. *See* Exhibit D.

42.   Defendant's infringement, use, sale and/or pirating of Plaintiff's copyrighted photograph has caused permanent and irreparable harm to Plaintiff.

43.   Unless an injunction is granted barring Defendant from further distributing, marketing, selling, publishing, or otherwise promoting its infringing broadcast and website and reproductions thereof, Plaintiff will continue to suffer ongoing irreparable harm.

44.   Plaintiff does not have an adequate remedy at law.

45.   Based upon the clear and willful violations in this case, and the unlawful inclusion of Plaintiff's photograph in the infringing broadcast, website and their continued existence, Plaintiff has a substantial likelihood of success on the merits.

46.   Greater harm will befall the Plaintiff than the Defendant if the injunctive relief herein is not granted.

47.   Pursuant to 17 U.S.C. § 502, Plaintiff respectfully requests this Honorable Court to grant a temporary and/or final injunction on such terms as this Court deems reasonable to prevent and restrain the infringement of Plaintiff's copyright.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter an Order:

(a)  restraining the Defendant and its agents, domestically and abroad, from promoting, selling, marketing, advertising, shipping, transporting (directly or indirectly) or otherwise moving in domestic or foreign commerce, any and all products which infringe upon Plaintiff's copyrighted work; and/or,

(b)  ordering Defendant to forfeit (and/or recall) the broadcast and website; and/or,

(c)  ordering Defendant to recall or remove any and all of its broadcasts, catalogs, websites, books, posters or brochures or other material which contain the Plaintiff's photograph; and/or,

(d)  ordering all of Defendant's agents to refrain from selling or marketing the infringing broadcast and website; and/or,

(e)  ordering that Plaintiff be remunerated for his work in any future versions broadcast; and/or,

(f)  providing such other relief as the Court deems just, including costs and attorney's fees.

## PLAINTIFF v. DEFENDANT
## COUNT III
### Violation of Digital Millenium Copyright Act
### 17 U.S.C. § 1202 et. seq.

48.   Averments 1 through 47 are hereby incorporated as though fully set forth herein at length.

49.   As aforementioned, Defendant stole the Plaintiff's photo (attached hereto as Exhibits A, or B), and thereby infringed Plaintiff's copyright therein on at least four occasions, as demonstrated in Exhibit C.

50.   In so doing, Defendant also eliminated the gutter credits and copyright notices in Exhibits A and/or B that identified Plaintiff (via his pen names G.W. Bridge and/or Triborough) as the author and/or copyright owner of the image represented therein. *Compare* Exhibits A, B, and C.

51.   Those pen names and/or copyright notices in the gutter credits in Exhibits A, and B constitute "copyright management information" pursuant to 17 U.S.C. §1202(c)(2) and (3), as they provide:

"(2) The name of, and other identifying information about, the author of a work.
 (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright."

7

*See* 17 U.S.C. §1202(c)(2) and (3).

52.     Plaintiff's copyright management information (as represented in the gutter credits in Exhibits A, and B) was intentionally removed by the Defendant when it stole Plaintiff's photograph, as aforementioned, and Defendant then intentionally republished the photo, without the gutter credits, as demonstrated in Exhibit C, knowing (or having reasonable grounds to know) that such removal would induce, enable, facilitate or otherwise conceal Defendant's blatant copyright infringement.

53.     Defendant's intentional removal of the gutter credits therefore constitutes a violation of 17 U.S.C. §1202(b), which holds that:

> "(b)No person shall, without the authority of the copyright owner or the law –
>
> (1) intentionally remove or alter any copyright management information,
> (2) distribute…copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
> (3) distribute…or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right under this title."

*See* 17 U.S.C. §1202(b).

54.     Because of Defendant's violation of 17 U.S.C. §1202, and pursuant to 17 U.S.C. §1203(c)(3), Plaintiff respectfully requests statutory damages in the amount of $25,000.

55.     Because of Defendant's violation of 17 U.S.C. §1202, and pursuant to 17 U.S.C. §1203(b), Plaintiff respectfully requests reasonable attorney's fees and costs.

56.     Maximum statutory damages and attorney's fees are particularly appropriate in light of Defendant's theft of Plaintiff's photograph and the infringement of his copyright on at least four occasions, and the obvious elimination of his copyright management information from their unlawful reproduction of Plaintiff's photograph.

       WHEREFORE, Plaintiff requests judgment against the Defendant for statutory damages in the amount of $25,000, plus reasonable attorney's fees, costs, and such other relief as the Court deems appropriate.

## PLAINTIFF v. DEFENDANT
## COUNT IV
### Request for Declaratory Relief pursuant to
### 28 U.S.C. §2201

57.     Averments 1 through 56 are hereby incorporated as though fully set forth herein at length.

58.     Upon information and belief, Defendant falsely filed for copyright protection on the broadcast and website, for in preparing and recording said filing, Defendant did not identify the same as being derivative of Plaintiff's copyrighted photograph.

59.     Defendant falsely filed for copyright protection on the broadcast and website, knowing that Plaintiff's photograph enjoys copyright protection.  This raises a legal dispute that can properly be decided by a request for a declaratory judgment that Defendant's copyright in the broadcast and website is invalid.

60.     Defendant's copyright in the infringing broadcast and website should be invalidated based upon Defendant's use of Plaintiff's original photograph for unlawful inclusion therein.

        WHEREFORE, Plaintiff respectfully requests for judgment declaring Defendant's copyright as it applies to the broadcast and website to be invalid as said copyright is a derivative of Plaintiff's copyrighted photograph, and Plaintiff is entitled to protection of the copyright.  Plaintiff also seeks all attorney's fees and costs incurred in seeking this declaratory action.


## DEMAND FOR JURY TRIAL

        Trial by a jury of twelve (12) persons is demanded as to all issues.


                                        Respectfully Submitted,


Date:  11/29/2011                       CC4013
                                        J. Conor Corcoran, Esquire
                                        Atty. I.D. No. 89111
                                        1617 John F. Kennedy Boulevard
                                        Suite 1130
                                        Philadelphia, PA 19103
                                        Phone: (215) 977-9300
                                        Fax: (215) 864-0188

# EXHIBIT A








# Phillyist Interviews... Larry Mendte



Last week, we sat down with CBS 3 Eyewitness News anchor Larry Mendte. This award-winning journalist is a native of Delaware County and has had a diverse career working at WCMH in Columbus, Ohio, WABC-TV in New York, WBBM-TV in Chicago, and KFMB in San Diego; performing stand-up comedy; doing feature stories for Hard Copy; and working as the first co-host of Access Hollywood. He is married to WTXF anchor Dawn Stensland and last year he was inducted into the Philadelphia Broadcast Pioneers Hall of Fame.

**Unlike a lot of talent in this market you are from the area (Lansdowne in Delaware County) and went to West Chester University. Do you feel that gives you a better perspective on things here?**
Absolutely. It actually does several things. First of all, I think I understand the people here and that is a huge plus. I think a lot of people come into the market and don't really get the people here – how they are all divided into neighborhoods, but joined by this common attitude and this common love of the city; and we express our love a little bit differently, we express it with a bit of an edge.

So people who don't know the city might take the booing or the sarcasm or the cynicism or the attitude as being negative. It really isn't, it is much our way of kidding each other, but deep down when something goes well, we love the city and when we feel we are being insulted by the outside you see everybody come together. So, I think I had that inherent understanding of what the city was all about.

Plus, it helps you pronounce some of the names a little bit better and also with contacts.
I used to kid because I always wanted to get a job in Philadelphia when I started out and I had this common cover letter that I sent to the news directors – I said I have about 500 members of my extended family in the area, that is worth at least a rating point. It helps a lot, this week I got three story ideas from relatives that call or write me every time. That courage to come forward story we did with the girl that was the key witness in the largest child porn ring ever uncovered in Delaware County, the reason we got her and no one else did is because my sister taught her in kindergarten. So I have some real strong ties to the community not only through me, but through my family. So it does help immensely.

Case 2:11-cv-07417-SD   Document 1   Filed 12/01/11   Page 13 of 27

**Were you influenced by people like John Facenda on television when you were growing up?**
Absolutely, although not so much John Facenda. I was a normal kid and didn't watch the news when I was five, six or seven, but some of my influences were certainly Larry Kane, certainly Jim O'Brien. I mean I loved Jim O'Brien. So many people in the Philadelphia area I think got into the business because of Jim O'Brien. Vince Leonard I loved on channel 3. Even later, I got into college and Jim Gardner started and I was a big fan of Jim Gardner. Herb Denenberg, I watched his reports, Sheila Allen Stephens, I loved all those people and here Robin Macintosh and Dick Standish.

I remember I was thrilled one time when I was working in Columbus and I followed John Glenn around on his campaign, because he was the senator from Ohio. I was in New Hampshire and I got to meet Dick Standish and it was a huge thrill for me. What is funny about that is that I have worked at *Access Hollywood* and I worked at WABC and I met some big people in the business and stars, but the people that really affect me are the people that I watched when I was growing up. So when I got to meet Herb Clarke and Al Meltzer, that was a big deal.

**You always wanted to come back, so we guess that you jumped at the opportunity when WCAU gave you the chance?**
Well no. It is a strange story. I always wanted to come back and I have been up for and lost several jobs here. I was offered at WPVI to do their morning newscast with Monica Malpas when they just started their morning newscast, but it wasn't the right time. I was having a great time in San Diego and I was thinking about a different career path. It killed me, but I didn't jump at that.

When I was in Columbus, I was offered by WPVI to come back and be a reporter and I was anchoring at the time and I really wanted to keep... in the anchoring and they couldn't promise that. When I was at WABC, they talked about me coming down here to WPVI to do their noon news, but that didn't work out. I would have done that one and that one I just didn't get.

When channel 29 started their newscast, they had me down and I thought I had that job and I was at WABC at the time and that one didn't work out. I interviewed at channel 3 when I was at WABC and that one didn't work out. They talked about me coming into WCAU to do sports one time and that one I didn't want to do.

So the time this came around they called me because the general manager at WCAU was Pat Wallace and he was also the general manager at an opposing station when I was in Chicago. I was doing all these kind of wild reports, long form reports. The magazine there did a story one time called "Cowboy News at Eleven" and they had me on the front.

I used to go in and most people do reports on fires from outside and I was inside walking through the buildings. We did these long form reports that nobody else was doing. We did these long choreographed live shots where [we] would walk through buildings. One time I was on a fire escape and we walked into the building then walked down the steps. It was really some interesting stuff and great television and true to the medium and it got some points across.

So he asked me to come here then, but didn't have a specific job, but then at the same time I got the offer from *Access Hollywood*. I said to him on the phone, "You know what happens when your dream job comes through finally and then a job beyond your wildest dreams comes through. What do you take?" And he said to me, "Which one am I?" And I said, "You're the dream job." And he goes, "Take that one." And I said, "You know I don't think so. I think I am going to try this *Access Hollywood* thing."

I went there and he stayed after me. They came out and Steve Doerr the news director came out and interviewed me out there after a while. I wasn't sure if *Access Hollywood* would stay on the air and they were bringing in people to audition for both of our jobs, Giselle [Fernández] and I. So I saw that that could be tentative and this was a long term contract, this was my home, this is where my mom was, this is where my daughter was, so it just made a lot of sense at that time. So I finally got to get my dream job and come back from WCAU.

**When you first came back to Philadelphia at WCAU, almost ten years ago you came from *Access Hollywood* and it caused a bit of controversy at the time. It seemed like your track record of award-winning, hard-hitting news reporting in Chicago and elsewhere just got thrown by the wayside. Do you feel that you made up for that initial skepticism?**
I don't think I had anything to make up for. I have always been a little bit controversial in the markets I have been in, especially in Chicago because of my style. I was controversial in San Diego, not so much at WABC because I was still learning the business and they accepted me more there and I got to be the lead reporter and weekend anchor there.

But certainly in the other markets I was used to taking criticism. I was used to taking shots in the paper because I wasn't just standing in front of buildings and I wasn't putting together reports that were just bland and facts, and I like to use music and I like to use production and I like to tell stories. You curse me for having people to want to watch my reports and be interested in them. Curse me for trying to get people's attention.

I think there are better ways to tell stories. So I was getting a lot of criticism already. So when I came here and there was some early criticism, I didn't care. I don't feel like I have anything to make up for. As a matter of fact, the

only thing I feel good about is that the market has changed since then.

In an article the *The Daily News* did when I was first on the air, they called me and said, "Why do you walk around so much?" And the article was entitled, "He's got ants in his pants." I remember the woman calling me, I think it was Ellen Grey from the paper, she called me and asked me, "Why are you walking around? Philadelphia is not used to that." And now everybody does. Now everybody's standing up and everybody is using boards, now everybody is doing it. It is just a progression in the market.

Everybody was so used to WPVI and three guys sitting behind a set.

**Sort of 1970s news?**
Right. So when I came in and started walking all around, it was a new way of doing it. Everybody now has wireless mics. When I first came here, we didn't have wireless mics and I said I can't do the newscast here unless you give me a wireless mic, I gotta move. The whole market has evolved, so I don't feel I have anything to apologize for.

Let me deal to the *Access Hollywood* thing for one second. It always cracks me up as a criticism. What I was doing there was interviews with some of the biggest stars in the world. Would anyone you know in journalism turn down those interviews? No, absolutely not. What I got was a lot of money to go on TV and movie sets and hang out with some of the most powerful people in the entertainment business. Do you know anybody who would turn down that job? No. And then the same people criticize you for taking that job and I know in their heart of hearts they wouldn't have turned that down. I don't regret for a second going to *Access Hollywood.*

It was a wonderful experience. It was probably not the job for me because I don't understand all of the Hollywood rules and how powerful the publicists are. I made them mad all the time because I would ask questions they didn't like or I would try to get interviews when it wasn't set up. So I was more of a news person, but boy what an incredible experience. Now I have this wealth of knowledge about how Hollywood works that I would have never had. I have done sports, I have done weather, I have done feature reports, I have done hard news, I have done investigations that have changed laws and every single one of those things has added up to making me a better broadcaster.

**You were both a reporter and an anchor. Do you prefer one to the other or do you enjoy doing both and do you think it has helped you become a better anchor?**
Many reporters want to anchor and it is a different set of skills. So yes, I think that being a reporter makes you a better anchor. I think all those things I just mentioned make you a better anchor. Any knowledge you may have, any reading you have at the anchor desk is important.

There are a lot of people that want to anchor that are great reporters, they are dogged and they can dig up a story, but there is something about a camera when they are anchoring, they don't make a connection from the anchor desk. It really is a different thing. So yes, I feel the experience of reporting helps me as an anchor especially during breaking news. I can just go for a couple of days just talking about something, that helped me because I used to do that as a reporter.

As far as the performance part of it, it is much different. I think with the camera, especially with anchors, they have to look at you and go, "Do I like this person? Do I trust this person?" and that you can't fake, and empathy you can't fake. There are some reporters who become hardened out when they are reporting, so when they go to anchor they don't have all of that and I was lucky to start anchoring before I lost that. There is a great line from the movie *Broadcast News* – the guy says you have to quit before you lose the ability to cry. I have never lost that.

**When you were in Chicago at WBBM you had a series of reports on school bus safety that led to laws being changed in Illinois, and when you were at KFMB in San Diego you did a series of lighter "How Come" feature stories. Do you like doing both the heavy stories and the lighter stories?**
Yeah. At the time I loved doing the comedy features and I loved producing those. The way those How Comes would happen is we asked people to send us some ideas and we would go to a gas station and ask, "How come they have a sign that says no smoking and they sell cigarettes?," stupid things like that. We'd act them out and we got people who were right there to be the actors and we would direct them. It was a pretty neat concept and it was fun and people loved them. They ran for a while on *Hard Copy* and we ran them for a while on The Movie Channel. I loved doing it.

I love doing the investigative pieces and other types of features that may not just be comedy. Now I am gravitating towards stories like the <u>Alex's Lemonade Stand</u> or the story I am working on right now which is a documentary on the <u>Beanie Baby soldier.</u> As I am getting older I am getting past the point where I appreciate so much the wonderful stories around me and the people around me and I want to tell their stories. I am gravitating toward, if you think about the Beanie Baby, Alex Scott and the girl in the courage to come forward, I am gravitating towards stories about people who are put in horrible situations and do wonderful things. These people are all around us and I would love to tell their stories and in those stories I find myself getting out of the way. Letting their stories be told. That is the kind of story I like now. So it is really not the investigation or doing the comedy stuff, although I would do either of those again because I enjoy doing them, but I think these stories are so important I am putting all my focus into that.

**You have another documentary in the works?**
The story we are doing, I pitched this and kind of fought for it, and I am so glad the station is doing it because it is not going to get ratings and we aren't going to get a lot of revenue out of it. We are doing one story on Memorial Day about this Beanie Baby soldier and we are splitting it up into two things.

He was a soldier who died in Iraq who saw the beauty in the Iraqi children in this horrible situation and started handing out Beanie Babies. What a wonderful thing to do. He was on the front line, he had every reason to hate these people and here he was giving out Beanie Babies and that is probably the greatest diplomacy you can have. These children are going to grow up with these toys given to them by an American solider, how can you hate us? So that is the one story.

Then I thought, wait a second. There are eighty-some people in this area that lost their lives and these families are going to be watching and going, "Well, my son is special, too." So after we show that story, we are going out next week, I am taking a gim camera and we are shooting "Amazing Grace" in a church and we are going to put up the pictures of everybody. Every third or fourth one we will hear a family member come in and talk about them. It is the first time it has been done in the market that everyone has been shown, so I am real proud of it. So that is what I love to do.

**Over the years you must have a favorite story or two you have covered.**
Alex Scott. That one probably moved and touched me more than anything else. So Alex Scott is my favorite story in this town.

The school bus stories that we did in Chicago that actually changed the laws there. We did a series of them, but the big one was we were granted access to the personnel files of the school bus drivers in the City of Chicago and they were supposed to be checked by the State Police and the school district wasn't doing it. So we pulled at random about 200 and 33 percent were convicted felons and a couple of them were put away for child molestation. So we brought that to light and it not only changed the law in Chicago, but it led to a national law that all the school bus drivers have to be FBI checked. I am real proud of that and I am proud of the Alex Scott story and I am proud of this thing we are doing on Memorial Day. I have already cried a couple of times during the story and I hope people are affected by it, too.

**You have also worked in Ohio, New York and Chicago. Is there much difference in how news is covered there compared to here?**
That is a very difficult question to answer because they are all different times and the business keeps changing and growing. So you don't know if it is really the market or it is the time, but I do think so. I think there are some markets that are more into entertainment, like LA; there are some markets that are more into feature reports, like San Diego; there are some markets that are into hard news and politics, like Chicago.

Philadelphia barely covers politics and for some reason Philadelphia is a big weather town, which you wouldn't even know if you were here. I think WCAU had a lot to do with that with John Bolaris and the weather team pushing them to beat WPVI. I think weather is what led the way. It is difficult to say how TV stations are different from market to market because the times are changing.

You have someone come into a station and go, "Wait a second, this is their weakness and let's exploit this," and that is what happened with WCAU and WPVI. They thought, OK WPVI doesn't have meteorologists and they have this old weather board, let's get real high tech with weather. We'll bring in all meteorologists, we'll get Doppler and it pushed the entire market, it changed the entire market and it also was extremely successful.

So I can't say, but I do believe there is a difference.

**Given you have the unique perspective of being the host of an entertainment news show and a news anchor, do you feel there has been a melding of news and entertainment over the past few years?**
Oh, absolutely. Walter Conkrite once said the worst thing that ever happened to news is the ratings system. I kind of disagree. I understand what he means, but it is the worst thing and the best thing that happened because once these companies figured out they could make money from news, then the ratings became important and that absolutely affects what we cover and what we do.

At the same time, we wouldn't have as many reporters, the news departments wouldn't be as big if it wasn't for that ratings system. So there is some good and some bad, there is some give and take and we do some wonderful things like the investigation Jim Osman did on the atrocities at the VA medical center and the fact that these guys who served our country are getting robbed. That is a wonderful story. I am sure in a couple of weeks we'll be doing how you look in a bikini. So there is good and there is bad, there is give and take and a lot of that is for ratings. But a lot of people have a deep sense of responsibility and that is what you drive for.

There has been a melding. Look at the Anna Nicole Smith story. Was that that big of a story? No, it wasn't that big of a story. It was titilating and people cared about it. I have gotten to a point where I could care less about what Britney Spears does and yet she is news. You almost have to serve that master, but hopefully you do it with enough balance where it doesn't overtake your newscast.

**Chaka Fattah**, the husband of your former co-anchor at NBC 10, **Renee Chenault-Fattah**, is a sitting congressman and running for mayor of Philadelphia. Do you feel there is a conflict of interest with her staying on with a husband who is active in politics?

Not while he is running. I can kind of understand what she is doing. I think she can recuse herself from enough stories right now while he is running for mayor that she can stay on the air. It will be intresting to see what she does and how the station handles it if he becomes mayor, that is completely different. I think while he is running she is safe and I support her decision.

Let me backup a second and say I think Renee Chenault-Fattah is wonderful. I loved working with her. I think she is very smart and very strong on the air. She is going to have to make this decision along with the station. I think she is probably their greatest asset. She is the strongest on-air personality they have over there as far as recognition in the market and what holds that station together. So it is going to be a difficult decision for the station. I think if she decides she can do it, she can play this balance, she'll stay on the air. I think a lot of it will be Renee's decision and if anyone can pull it off she can.

*Contact the author of this article or email tips@phillyist.com with further questions, comments or tips.*

By G. W. Bridge in Arts & Events, Miscellaneous on May 3, 2007 4:00 PM      0 Comments      2 Likes

ACCESS HOLLYWOOD    CBS    CHICAGO    COLUMBUS    COMEDY    DELAWARE COUNTY    EYEWITNESS NEWS    HOLLYWOOD    INTERVIEW    LARRY

MENDTE    LOVE    NEIGHBORHOODS    NEW YORK    NEWS    PEOPLE    PHILADELPHIA    PORN    SAN DIEGO    SO I    TELEVISION    THE CITY    THIS

WEEK    TV    UNIVERSITY    US    WABC    WEST CHESTER    WEST CHESTER UNIVERSITY

**EMAIL THIS ENTRY**

To:                              From:

Message (not required):

[Send]

**SHARE THIS ENTRY**

[Like]  5        add to digg

0        add to stumble upon

add to reddit

**OTHER INTERESTING STORIES**

**WE RECOMMEND**                    **MORE FROM OUR PARTNERS**

To increase the security and stability of our sites, Gothamist has decided to stop collecting or storing commenter logins. To comment, please login with Disqus, Facebook, or Twitter. If you want to claim your previous comments, please create a Disqus login, and then claim them using these instructions. Thanks!

Comments [rss]

# EXHIBIT B

KYW CBS 3: Larry Mendte | Flickr - Photo Sharing - Mozilla Firefox

File   Edit   View   History   Bookmarks   Tools   Help

**flickr** from YAHOO!

Home   The Tour   Sign Up   Explore ▾   Upload

You aren't signed in.   Sign In   Help

Search

☆ Favorite   Actions ▾   Share ▾

← Prev   ⊕   Next →



### KYW CBS 3: Larry Mendte

Photo taken to go with this Phillyist interview with Larry Mendte.

By Triborough
No real name given   + Add Contact

This photo was taken on April 27, 2007 in Philadelphia County, Pennsylvania, US, using a Nikon D80.

▬ 4,206 views   ☆ 1 favorite

This photo belongs to

▸ Triborough's photostream

This photo also appears in

KYW and WPSG - 27 April 2007 (set: 77)

▸ People (set)

▸ April 2007 (set)

start   |   cathy ltr 4-9-10 - Micr...   |   Complaint - Microsoft...   |   KYW CBS 3: Larry Me...   |   A - Windows Picture...   4:07 PM   Wednesday   11/23/2011



# EXHIBIT C









# EXHIBIT D

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Acting Register of Copyrights, United States of America

**Registration Number**

## VA 1-763-148

**Effective date of
registration:**

March 18, 2011

---

## Title

Title of Work: Mendte Photograph

## Completion/Publication

Year of Completion: 2007

Date of 1st Publication: May 3, 2007     Nation of 1st Publication: United States

## Author

Author: Jason DeCesare

Author Created: photograph(s)

Work made for hire: No

Citizen of: United States     Domiciled in: United States

Year Born: 1974

## Copyright claimant

Copyright Claimant: Jason DeCesare.

145 W Gravers Lane, Philadelphia, PA, 19118, United States

## Rights and Permissions

Organization Name: Law Office of J. Conor Corcoran

Name: J. Conor Corcoran

Email: conorcorcoran@yahoo.com     Telephone: 215-977-9300

Address: 1617 JFK Blvd

Suite 1130

Philadelphia, PA 19103  United States

## Certification

Name: J. Conor Corcoran

Date: March 18, 2011

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jason DeCesare, individually, and p/k/a G.W. Bridge, or Triborough, 145 W. Gravers Lane, Philadelphia, PA 19118 | : : : : : : **CIVIL ACTION** : |
| **Plaintiff,** | : **No.** : |
| v. | : **JURY TRIAL DEMANDED** : |
| Comcast Corporation One Comcast Center 1701 John F. Kennedy Boulevard Philadelphia, PA 19103 | : : : : : |
| **Defendant.** | : : |

## CERTIFICATE OF SERVICE

I, J. Conor Corcoran, Esquire, hereby certify that a true and correct copy of the Complaint in the above captioned matter has been sent to the following by first class, United States, certified mail:

**Comcast Legal Response Center**
650 Centerton Road
Moorestown, NJ 08057

VIA FIRST CLASS MAIL
AND FAX: 866-947-5587


Date: 11/29/2011                    CC4013
                                    J. Conor Corcoran, Esquire

10